FILED
IN CLERK'S OFFICE

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS -3  P  4: 38

-------------------------------------------------------x

HOLDEN COMMONS, LLC,

                       Plaintiff,

           v.

BIG Y FOODS, INC.,

                    Defendant.

-------------------------------------------------------x

          :

          :

          :

          :

          :

          :

04-40149

Civ. A. No. _____

## PLAINTIFF'S MEMORANDUM OF LAW IN
## SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

      This is an action to enforce the unequivocal terms of a commercial lease.  The

plaintiff, Holden Commons, LLC, is the landlord under a lease agreement with its tenant,

defendant Big Y Foods, Inc. ("Big Y"), which operates a supermarket in a shopping

center owned by plaintiff in Holden, Massachusetts.  Big Y wishes to change the use

provision of the lease, Section 5, in order to add a pharmacy on its premises that

dispenses prescription drugs.  The lease forbids such a change.

> "Lessee may elect to change the use of the premises, for any lawful
> purpose provided that at the time of such change in use there is not
> then a competing business located within the shopping center and
> further provided that it obtains the consent of Lessor, which
> consent shall not be unreasonably withheld or delayed." (emphasis
> supplied)

      The terms of the Big Y lease, Section 2(b), also required the lessor to find and

execute a lease with "a drug store with a pharmacy being operated by a regional major

chain" as a condition precedent to Big Y opening its doors for business.  Pursuant to that

requirement, lessor executed a lease with CVS Pharmacy ("CVS").  Under the terms of

the CVS lease, CVS was given the exclusive right to operate a pharmacy in the shopping center.

Because of these provisions in the leases and the presence of CVS in the shopping center, the lessor refused to consent to Big Y's desire to open a pharmacy on its premises. Notwithstanding the lessor's lack of consent, Big Y has announced its intention to expand its supermarket operation to include a pharmacy. Accordingly, Holden Commons seeks immediate injunctive relief to prohibit Big Y from operating a pharmacy in its supermarket.

## BACKGROUND

The lease was executed on April 15, 1988 between Big Y and plaintiff's predecessor-in-interest, Angelo A. Scola, Trustee of Reservoir Realty Trust. Holden Commons assumed the interest of Landlord under the lease in 1999. Although the lease has twice been amended to expand the square footage, adjust the rent, and extend the term, the basic terms have not changed. The lease contains a governing law provision, by which the parties agreed to interpret the lease in accordance with Massachusetts law.

**Operating A Pharmacy Is Not A Use Permitted Under The Lease**

The main dispute centers on section 5, the "Use" provision, of the lease. Under that provision, Big Y agreed "to use the premises for the initial purpose of operating a store commonly known as a supermarket selling merchandise customarily carried in supermarkets." (Lease § 5, Ex. A at 13.)[*] When the lease was executed in April 1988, it was not customary for supermarkets in the Commonwealth of Massachusetts to sell prescription drugs. The typical merchandise carried by supermarkets was groceries,

---

[*] A copy of the lease, as amended, is attached to the Complaint as Exhibit A.

meat, fish, fruits, vegetables, food products and food supplies of any kind.  This fact is

evidenced by two provisions in Big Y's lease.

> First, Section 6 entitled "<u>Restrictions on Use</u>" provides:

> "The Lessor will not lease, rent or permit to be occupied by any person
> any part or the whole of any premises owned, leased or controlled by
> Lessor...within the entire premises, or within a distance of five (5) miles
> from any portion of the premises...<u>for the sale of groceries, meat, fish,
> fruits, vegetables, food products and food supplies of any kind, at
> wholesale or retail or for off premises consumption</u>, with the exception of
> the normal drug store...and with the exception of a convenience store
> which is not in excess of 5,000 square feet." (Lease § 6, Ex. A at 14-15,
> emphasis supplied)

This language (a) evidences the type of merchandise the parties to the lease

thought was customarily sold in supermarkets and (b) underscores the fact that

drugstores were not included within customary supermarket operations.

> Second, Section 2(b), entitled "<u>Term and Options to Extend</u>," provides:

"Notwithstanding anything contained above to the contrary, Lessee shall not be required

to open for business, nor shall the Commencement Date be deemed to have occurred until

such time as Lessor has executed [a] lease[]...with a pharmacy being operated by a

regional major chain." (Lease § 2(b), Ex. A at 4.)  This provision required lessor to

execute a lease with a pharmacy operated by a regional major chain as a precondition to

Big Y opening its supermarket for business in the shopping center.

> Equally important, until five months before the lease was executed, it was illegal

for a supermarket to operate a pharmacy in the Commonwealth of Massachusetts.  On

November 3, 1987, the Massachusetts Legislature amended M.G.L. c. 112, §§ 38, 39 to

allow supermarkets to obtain permits to dispense prescription drugs.  <u>See</u> <u>Shepard's</u>

Pharmacy, Inc. v. Stop & Shop Companies, Inc., 37 Mass. App. Ct. 516, 518 n.2, 640 N.E.2d 1112, 1113 n.2 (1994).

These facts indicate both that the parties did not regard prescription drugs as merchandise customarily sold in a supermarket and that, whatever the parties thought, prescription drugs could not have been customarily sold in supermarkets because such sales would have been illegal until five months before the Big Y lease was executed.

**Changing The Permitted Use Requires That
There Be No Competing Business In The Shopping Center
And The Landlord's Consent, Which Cannot Unreasonably Be Withheld**

Section 5, the Use provision, also restricts Big Y's ability to change its use if the new use competes with an existing business in the shopping center. Section 5 provides that the lessee may seek "to change the use of the premises, for any lawful purpose provided that at the time of such change in use there is not then a competing business located within the shopping center and further provided that it obtains the consent of Lessor, which consent shall not be unreasonably withheld or delayed." (Lease § 5, Ex. A at 14.)

The lease thus imposes two prerequisites to any change in use: (1) that there is not then a competing business located within the shopping center, and (2) provided further that Big Y obtains the consent of lessor, which cannot unreasonably be withheld. Section 5 could be interpreted to mean that the Landlord's consent is required for a change in use only if the new use does not compete with an existing business in the shopping center. Certainly where the new use competes with an existing business, it must follow *a priori* that the lessor's refusal to consent to the new use cannot be unreasonable. Big Y simply

ignores the "competing business" restriction despite the fact that it agreed to this limitation when it executed the lease.

CVS sells prescription drugs. Under the proposed change in use, Big Y would also sell prescription drugs. Manifestly, that change would make Big Y and CVS competing businesses, which is not permitted under the plain terms of the lease.

ARGUMENT

Plaintiff files this motion pursuant to Fed. R. Civ. P. 65 because without immediate injunctive relief barring Big Y from operating a pharmacy, plaintiffs will suffer immediate and irreparable harm. Plaintiff is entitled to the relief sought because, as demonstrated below, (1) it is likely to prevail on the merits of its claims, (2) it will suffer irreparable harm absent the relief sought, (3) the balance of the equities favors granting the injunction, and (4) the injunction would not harm the public interest. Packaging Indus. Group, Inc. v. Cheney, 380 Mass. 609, 616-17, 405 N.E.2d 106, 112 (1980); Ocean Spray Cranberries, Inc. v. Pepsico, Inc., 160 F.3d 58, 60-61 (1st Cir. 1998) (noting that "Massachusetts standards for a preliminary injunction do not seem markedly different" from the federal standard such that the review of a diversity court applying Massachusetts law would differ).

## I. There Is A Likelihood Of Success On The Merits Because Operating A Pharmacy Is Not A Permitted Use, CVS Is A Competing Business, And Plaintiff's Refusal To Consent To The Change In Use Was Reasonable

Commercial leases, like any contract between sophisticated parties, should be construed strictly, and where the parties choose to embody their agreement, as they did here, "in a detailed and carefully crafted written Lease, perhaps more than in other situations[,] they are entitled to and should be held to the contractual language they

chose." Slawsby v. Cifrino, No. 03-1515-BLS, 2003 WL 21527602, at *7 (Mass. Super.

Ct. June 13, 2003) (van Gestel, J.) (attached hereto at tab 1); K-Mart Corp. v. Oriental

Plaza, Inc., 875 F.2d 907, 915-16 (1st Cir. 1989) ("[W]here 'the transaction is

commercial, the principals practiced and represented by counsel, and the contract itself

reasonably clear, it is far wiser for a court to honor the parties' words than to imply other

and further promises out of thin air.'") (quoting Matthewson Corp. v. Allied Marine

Indus., Inc., 827 F.2d 850, 856 (1st Cir. 1987)).

### A. Because Prescription Drugs Were Not "Customarily Carried In Supermarkets," A Pharmacy Is Not A Permitted Use

Although the Use provision does not specifically define the merchandise

customarily carried in supermarkets, it is clear that the Restrictions on Use provision

evidences the type of merchandise that the parties thought was customarily carried by

supermarkets when the lease was executed – "groceries, meat, fish, fruits, vegetables,

food products and food supplies of any kind". (Lease § 6, Ex. A at 15.)  Recently in

Slawsby v. Cifrino, Judge van Gestel of the Massachusetts Superior Court was

confronted with the issue of whether customarily sold items in a supermarket included

specialty foods.  In accepting the opinion of  plaintiff's expert, the Judge stated: "the

current definition in the industry of a supermarket is: 'A self-service retail food store,

with annual sales of $2 million dollars or more, which contains basic departments

offering groceries, meat, fish, produce, dairy products and frozen foods.'" 2003 WL

21527602 at *5.  In other words, even today prescription drugs are not regarded as items

customarily sold in a supermarket in this Commonwealth.

Moreover, prescription drugs are not "merchandise" as that term is used in the

lease.  Under the lease, merchandise carried by supermarkets included "groceries, meat,

fish, fruits, vegetables, food products and food supplies of any kind." (Lease § 6, Ex. A at 15.) Prescription drugs, which require a separate license to sell, do not fit within any of those broad categories. Indeed, the sale of prescription drugs is more a service than it is a commodity and hence not "merchandise" under the lease.

### B. Big Y May Not Change Its Use Of The Premises Under The Lease Because CVS Is A Competing Business

Big Y's intention to expand its supermarket operation to sell prescription drugs violates the plain language of the lease, which prohibits new uses if they compete with an existing business in the shopping center. Big Y's disregard of restrictions in the lease is all the more obnoxious because (a) it compelled the lessor to execute a lease with a pharmacy as a condition precedent to the commencement of Big Y's operations, (b) it negotiated a use restriction in its lease to protect its supermarket operation from competition within a radius of 5 miles around the shopping center, and (c) it agreed not to expand into a use that competed with existing businesses in the shopping center.

### C. Holden Commons Did Not Unreasonably Withhold Its Consent In Order To Honor Its Exclusive With CVS

Holden Commons did not unreasonably withhold consent to Big Y's expansion of its operation to include a use that competes with an existing business in the shopping center. Under the circumstances of this case, the lessor's decision to deny the change in use has to be regarded as reasonable. Under the terms of CVS's lease, it has the exclusive right to operate a pharmacy in the shopping center, and CVS's presence in the shopping center is the direct result of the requirements of § 2(b) of Big Y's lease. Moreover, CVS's pharmacy would compete with the pharmacy that Big Y intends to add to its supermarket operation.

**II.    Holden Commons Will Suffer Irreparable Harm If Big Y Opens A Pharmacy Because That Will Be Cause For Termination Of The CVS Lease, <u>Which Would Call Into Question The Viability Of Other Tenants' Businesses</u>**

If Big Y continues with its announced plan to open a pharmacy, Holden Commons will be irreparably harmed. The long-term lease it holds with CVS would become terminable at will by CVS. (CVS Lease § 31, Ex. B at 18.) "In the event that Landlord shall violate the [exclusivity] provisions of this Article, the Tenant, at any time thereafter, may, at its option . . . cancel and terminate the Lease . . . ." (<u>Id.</u>) Therefore, should Big Y begin to operate a pharmacy, that would violate the terms of CVS's exclusivity clause, because the landlord may not "lease any space in the shopping center . . . or permit the use or occupancy of any such space, for a . . . pharmacy prescription department." (<u>Id.</u> at 17.) If Holden Commons is in breach of the exclusivity clause, CVS "may, at its option, either (i) cancel and terminate the lease...or (ii) … continue to operate in its premises but with a Fixed Rent reduced to a level equal to fifty (50%) percent of the Fixed Rent reserved under the terms of said lease...." (<u>Id.</u> at 18.) In other words, if Big Y is permitted to expand its business to compete with CVS, CVS has the right either to terminate its lease or to reduce its fixed rent by fifty percent (50%) until the "violation is permanently rectified." (<u>Id.</u>)

Moreover, if CVS elects to terminate its tenancy, that would call into question the viability of other businesses who rely on the foot traffic generated by CVS. Just as the Big Y lease requires the presence of a drug store in the shopping center, other businesses are dependent on CVS as well. If CVS opts to relocate, other tenants may do the same.

That could trigger a domino effect, and the damages from such an exodus would be incalculable.

These types of injuries are precisely the kind of harm courts have deemed irreparable. See, e.g., K-Mart Corp., 875 F.2d at 915-16 (affirming preliminary injunction for breach of commercial lease where "the loss of revenues . . . [w]ere sufficiently problematic as to defy precise dollar quantification"); Ocean Spray, 160 F.3d at 61 ("[I]njunctive relief requiring performance of a contract may ordinarily be granted . . . where monetary damages will not afford complete relief" or "where harm caused by a breach, although economic in nature, is impossible to measure accurately").

The harm caused by Big Y's breach in this case would be just as irreparable as the harm in K-Mart. In that case, the First Circuit affirmed an injunction in favor of a commercial tenant, who successfully enjoined its landlord from building additional retail space that interfered with the public's access to its business. The court upheld the injunction, noting that "injuries to real estate interests frequently come within the ken of the chancellor," i.e., subject to the court's equitable powers. K-Mart Corp., 875 F.2d at 915. Among the affirmative relief granted in that case, the defendant was forced to raze the portion of the structure that it built without consent. Id. at 910, 916. The harm was irremediable because it was not merely lost sales, which are themselves difficult to calculate, but also from other intangibles such as "diminished visibility, restricted access, [and] less commodious parking." Id. at 915.

Here, the harm is at least as great because the effect of Big Y opening a pharmacy would put Holden Commons in violation of the exclusivity agreement it has with CVS and could cause CVS to terminate its lease. If CVS terminates its tenancy, not only

would that reduce Holden Commons' rental income, but it would also result in reduced foot traffic and a consequent reduction in "impulse shopping" on which other tenants' businesses depend. K-Mart, 875 F.2d at 910 (noting irreparable injury to goodwill where "the chances of impulse shopping were lessened").

**III.    The Balance Of Equities Favors Holden Commons Because Big Y Should Bear The Risk And Cost Of Changing Its Business To Compete With CVS And The Fair Enforcement Of Contracts Best Serves The Public Interest**

Big Y should not be permitted, 16 years after the execution of its lease, to undertake action which will have the effect of causing the lessor to bear the risk and expense of the consequences of Big Y's decision to open a pharmacy that competes with CVS. Big Y's lease has been amended twice, most recently in 2002. On neither occasion was the "competing business in the shopping center" language amended. To permit Big Y to sell prescription drugs would amount to a *post-factum* amendment of that language. Cf. Guerin v. Stacy, 175 Mass. at 597, 56 N.E. at 892 (admonishing courts "to enforce contracts according to their plain meaning and not to undertake to be wiser than the parties").

Under the extant circumstances, the balance of the equities clearly favors granting the injunction sought by plaintiff. Cf. K-Mart, 875 F.2d at 916 (affirming injunction where the harm to the defendant included razing a building that was nearly half complete because its "wound, deep as it appears, was self-inflicted"). Furthermore, the public interest is always served by enforcing the terms of an agreement reached by the parties. ("[T]here is a strong public interest in fair dealing and the solemnity of contracts; if commerce is to function in our capitalistic system, entrepreneurs must play by the rules.").

<u>CONCLUSION</u>

For the foregoing reasons, the Court should grant the preliminary injunction and

enjoin Big Y from opening a pharmacy in contravention of the terms of the lease.

Respectfully submitted,

HOLDEN COMMONS, LLC
By its attorneys,

Rudolph F. Pierce (BBO #399380)
Dennis A. Murphy (BBO #645168)
GOULSTON & STORRS, P.C.
400 Atlantic Avenue
Boston, Massachusetts 02110
(617) 482-1776

Dated: August 3, 2004

<u>CERTIFICATE OF SERVICE</u>

I, Dennis A. Murphy, hereby certify that I served a copy of this Plaintiff's
Memorandum Of Law In Support Of Motion For Preliminary Injunction by overnight
mail on David A. Shrair, Esq., Cooley Shrair, P.C., 1380 Main Street, Springfield,
Massachusetts 01103, attorney for defendant Big Y Foods, Inc.

Dennis A. Murphy

Dated: August 3, 2004



Westlaw.

Not Reported in N.E.2d
16 Mass.L.Rptr. 405
(Cite as: 2003 WL 21527602 (Mass.Super.))

Superior Court of Massachusetts.

Stanley SLAWSBY et al. [FN1],

FN1. Judith Slawsby and Capitol Food
Corp. of Fields Corner.

v.
Paul J. CIFRINO et al.

No. 031515BLS.

June 13, 2003.

FINDINGS, RULINGS AND ORDER FOR
JUDGMENT ON COUNT I AND COUNT IV

ALLAN VAN GESTEL, Justice of the Superior
Court.

*1 This matter comes before the Court on a
jury-waived trial of Counts I and IV of the
complaint. These two counts seek declaratory relief
regarding the meaning of the word "supermarket" as
used in a certain lease (Count I) and the right to
exercise a certain "right of first refusal" relating to
property adjacent to the leased premises (Count
IV). The remaining counts of the complaint are
reserved until after Counts I and IV are finally
resolved.

FINDINGS OF FACT

The plaintiffs Stanley Slawsby and Judith Slawsby
(collectively, the "Slawsbys"), reside in Newton,
Massachusetts. For all purposes of this case, the
Slawsbys have been, and still are, the owners of all
of the capital stock of the remaining plaintiff
Capitol Food Corp. of Fields Corner ("Capitol").

Capitol operates a supermarket at 500 Geneva
Avenue in the Dorchester section of Boston (the
"Premises").

The defendants Paul J. Cifrino and Thomas M.
Cifrino are Massachusetts residents. They currently
are Trustees of Fields Station Realty Trust under a
Declaration of Trust dated October 15, 1973, and
duly recorded in the Suffolk County Registry of
Deeds in Book 8669, Page 147 (the "Trust").

At all material times, and continuing to the date of
the trial in this case, the Trust has been the owner of
the Premises, which is approximately 21,000 square
feet of a Mall (the "Mall") owned by the Trust. The
Mall has approximately 14 currently occupied
tenant spaces, of which the Premises is the second
largest.

Since October 1996, Capitol has operated a
supermarket at the Premises pursuant to an
Indenture of Lease (collectively with its
amendments, the "Lease") dated January 7, 1965,
originally by and between Paul J. Cifrino, John P.
Cifrino and James P. Cifrino, Trustees of Fields
Station Realty Trust [FN2] as Landlord and
Supreme Fields Corner, Inc. as Tenant. The Lease
was amended three times: First Amendment of
Lease, dated February 1, 1968; Amendment of
Lease, dated January 8, 1982; and Second [sic]
Amendment [FN3] to Lease, dated November 13,
1985.

FN2. Apparently originally dated August
25, 1964, and recorded with Suffolk
Deeds, Book 7920, Page 404.

FN3. Actually, this was the third
amendment, the second having occurred on
January 8, 1982.

When originally executed, the Lease contained a
number of provisions favorable to the Tenant. This
is not surprising, as the Cifrino family, which
included the Trustees of the Trust which was the
Landlord, also was the owner of the original
supermarket tenant, one of the "Supreme Market"

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in N.E.2d
16 Mass.L.Rptr. 405
(Cite as: 2003 WL 21527602 (Mass.Super.))

Page 2

chain of stores.

As originally executed in January 1965, the Lease had a term of 20 years, with two successive options for the Tenant to extend for 10 years each. The February 1, 1968, First Amendment of Lease changed the extension options in favor of the Tenant, from two successive options of 10 years each to six such successive options of 10 years each, thus making it an 80-year lease from 1965 to 2045.

The following are certain significant portions appearing in the original Lease and its amendments.

*Lease, Article VII, Sec. 1.*
The portion of the demised premises marked "Supermarket" on said Exhibit A shall be used only for the conduct thereon of a supermarket business, which business may include the sale of such items as are presently sold, or as may be sold from time to time by Tenant in its stores, or by its competitors or any of them conducting similar businesses, except as restricted by the provisions of Article VII, Section 4(C) of the lease from the Landlord to Stop & Shop, Inc. demising premises in the Shopping Center ("Stop & Shop lease") ... [FN4]

> FN4. This latter exception regarding Stop & Shop related to certain protections from competition for a general merchandise store and did not become a factor in this case.

*Lease, Article XI.*
*2 Tenant shall have the right to assign the lease or to make any sublease of the demised premises, or any portion thereof subject always to the terms of this lease, including without limitation the provisions of Article VII hereof. Notwithstanding any such assignment or sublease, Tenant shall remain fully liable on this lease.

*Lease, Article XVIII, Sec. 14.*
This instrument contains the entire and only agreement between the parties, and no oral statements or representations or prior written matter not contained in this instrument shall have

any force or effect. This lease shall not be modified in any way except by a writing executed by both parties. The attached Appendix is a part of this lease.

*Amendment of Lease, January 8, 1982, Sections 1 and 2.*
1. Notwithstanding the terms of the Lease which permit Tenant to assign or sublet without obtaining Landlord's consent, Landlord's prior written consent to the assignment of this Lease or the subletting premises occupied by Tenant's supermarket shall be required if (a) Tenant desires to assign this lease or sublet such premises for use other than a supermarket for a term which commences after or extends beyond the initial term of the Lease, (b) such assignment or subletting is to a non-affiliated party and (c) Tenant paid or was obligated to pay percentage rent during either of the preceeding two lease years. In the event Landlord's consent is required pursuant to the provisions of this Section, the provisions of Sections 2-10 below shall apply.
2. Tenant shall give Landlord notice of its intent to so assign this Lease or sublet such premises at least thirty (30) days prior to the proposed execution of such assignment or sublease. Such notice shall set forth the name of the proposed assignee or subtenant, the intended use of the leased premises, and the rent or other consideration to be paid by such assignee or subtenant and all other financial details of the proposed transaction.
Over the years leading up to October 1996, when Capitol became the Tenant under the Lease, the prior tenants were first a Supreme Market and then a Purity Supreme Market.

When Capitol took over the Premises, it executed an Assignment and Assumption of Lease, dated September 9, 1996, with PSLP Realty Corp., the latter being the then holder of the Landlord's and Tenant's interests in the Lease. Included in the Assignment and Assumption of Lease, as Section 3, is the following:
*Confirmation of Use Provision.* The parties hereto hereby confirm that, notwithstanding anything to the contrary contained in the Lease (and any amendments thereto), express or implied, including without limitation, Section 9 of that certain Amendment of Lease dated January 8,

Not Reported in N.E.2d
16 Mass.L.Rptr. 405
(Cite as: 2003 WL 21527602 (Mass.Super.))

1982 (the "First Amendment"), [FN5] the supermarket portion of the Demised Premises shall be used only for the conduct of a supermarket business consistent with the provisions of Article VII of the original lease document dated January 7, 1965. The First Amendment contains specific provisions for the Landlord's consent in the case of certain proposed assignments of the lease or sublettings of the Premises for use other than as a supermarket, which are not intended to be altered by this provision and remain in full force and effect.

> FN5. Actually, this was the second amendment, the first having occurred on February 1, 1968.

*3 Section 9 of the January 8, 1982, Amendment of Lease addressed instances in which the Tenant might use the Premises "for non-supermarket purposes." It recites methods for the Landlord and Tenant reaching agreement on percentage rental payments in such circumstances. This situation is not a matter in issue in this case.

In the fall of 2000, Capitol's principal supplier--and an entity with secured interests in Capitol's business--began to aggressively press for payments on outstanding debt. As a result, Stanley Slawsby began a series of meetings with Paul Cifrino, seeking advice and assistance with the financial aspects of Capitol's business. Paul Cifrino was a friend and also was highly regarded as one of the original leaders in the supermarket business in the Boston area.

Among other things discussed between Stanley Slawsby and Paul Cifrino was the possible expansion of the Capitol Market. Capitol, at that time, was about 20,000 square feet smaller than the optimal size for a supermarket in the Boston area. There was a meeting on October 10, 2000, at which Stanley Slawsby told Paul Cifrino that he--Slawsby--wanted to show his pressing creditor that Capitol had a right to expand its store space. Paul Cifrino offered and sent a letter to Stanley Slawsby, dated October 11, 2000, on the letterhead of "Cifrino Realty Trust." The substantive part of the letter reads:

This letter will confirm and record our understanding regarding additional area for your supermarket operation at the Fields Corner Shopping Center. This operation occupies about 20,000 square feet of space and the Bradlee store has about 50,000 feet of total area. The Bradlee lease expires at the end of the year 2005 and may, possibly, terminate sooner.

Should the Bradlee tenancy terminate, either at the end of the present lease or sooner, we shall offer your Capitol Food store a first refusal on up to 20,000 feet of the area currently occupied by Bradlee for expansion of the Capitol Food store area.

This is a firm commitment.

With every good wish.

/s/ Paul Cifrino

Trustee, Fields Station Realty Trust

Stanley Slawsby neither paid for, nor granted to Paul Cifrino anything in return for, the foregoing letter. Nor was there any evidence presented that the Slawsbys or Capitol did or took, or declined to take, any action in reliance upon the letter.

The other major tenant at the Mall was a Bradlee's Department store. It was located immediately adjacent to Capitol, such that the two stores shared a common wall. Bradlee's went into bankruptcy and closed its store at the Mall early in 2001. This closing seems to have had a serious adverse effect on Capitol's financial operations. Capitol's business dropped by almost 15% after the Bradlee's closing, and its financial losses have continued to date.

In the late spring of 2001, Winvest Investment Company LLC, an entity that operates five "Super 88 Markets" in the Boston area ("Super 88"), through a broker, contacted Paul Cifrino expressing an interest in becoming a tenant at the Fields Corner Mall. Cifrino referred Super 88's broker to the Slawsbys. Thereafter, there was some communication between Super 88 and the Slawsbys, but those initial conversations went nowhere because the amounts of money Super 88 proffered were, in the Slawsbys' view, far too low.

*4 Super 88 began its business in the Boston area with a store in the Chinatown section of the city. It has since expanded, with stores at South Bay Mall just west of the Southeast Expressway in the Dorchester/South Boston area, in Allston near the intersection of Commonwealth and Brighton

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in N.E.2d
16 Mass.L.Rptr. 405
(Cite as: 2003 WL 21527602 (Mass.Super.))

Page 4

Avenues, at a new store being developed in Quincy, and at another location in Boston on Herald Street.

On May 26, 2003, the Court, along with counsel for the plaintiffs and counsel for the defendants, took a view. Included in the view, in the order stated, were the Capitol Market at Fields Corner, the Super 88 at South Bay and the Super 88 in Allston. In the view, the parties toured each market fully, walking up and down each aisle in the stores, examining the layouts and the products for sale.

As Capitol's financial picture darkened, its negotiations with Super 88 resumed. Finally, on April 30, 2002, the Slawsbys entered into an agreement with Winvest Investment Company LLC for the sale of 100% of the stock of Capitol Foods Corp. of Fields Corner. The transaction was contingent upon the buyer being successful in gaining the additional 20,000 square feet of space in the adjacent former Bradlee's premises. The Slawsbys, under the agreement, were to be paid $1 million in cash, $750,000 paid over time, and an assumption of another $800,000 in liabilities.

Shortly thereafter, Super 88, through its brokers, began discussions with Paul Cifrino, regarding the agreement with the Slawsbys and the desire of Super 88 to exercise the option for the additional 20,000 square feet of space in the Bradlee's location. In this regard, by letter dated May 14, 2002, Super 88 proposed three different scenarios to Paul Cifrino: (1) a 20,000 square foot option expansion into the space adjacent to Capitol; (2) a lease of the entire adjacent 50,000 square feet; and (3) a purchase or long-term master lease for the entire property at the Mall.

Paul Cifrino did not accept any of Super 88's proposals. In fact, fairly soon after they were made, Paul Cifrino, though his attorney, sent two abrupt and unexpected notices to Capitol. Both notices came by certified mail and both were dated May 30, 2002. The first notice charged Capitol with certain deficiencies with regard to the payment of percentage rent. It claimed a default in such payment in the amount of $33,451.

The second notice related to the Super 88 transaction. It read as follows:
As you know, we represent Paul J. Cifrino, as he

is Trustee of Fields Station Realty Trust, your landlord under the Lease. Article VII of the Lease requires that the portion of the demised premises marked "supermarket" on Exhibit "A" to the Lease shall be used only for the conduct thereon of a supermarket business.
Article XI of the Lease permits Tenant to assign the Lease subject to the terms thereof, provided that Tenant remains fully liable thereunder. However, pursuant to para. 1 of the Amendment of Lease dated January 8, 1982 (the "1982 Amendment of Lease"), notwithstanding the terms of the Lease permitting Tenant to assign or sublet without first obtaining Landlord's consent,
*5 Landlord's prior written consent to the assignment of this Lease, or the subletting of the premises occupied by the Tenant's supermarket shall be required if (a) Tenant desires to assign this Lease or sublet such premises for use other than as a supermarket for a term which commences after or extends beyond the initial term of the Lease, (b) such assignment or subletting is to a non-affiliated party, and (c) Tenant paid or was obligated to pay percentage rent during either of the preceding two lease years.
Landlord has recently been advised by representatives of Super 88 (operators of one or more oriental specialty markets) of Super 88's desire to take an assignment of the lessee interest in the Lease, or to enter into a sublease of the demised premises. In view of the fact that Super 88 operates oriental specialty markets, *Notice* is hereby given that any such assignment or subletting would be prohibited and therefore void without your first obtaining Landlord's prior written consent in the manner prescribed by paras. 2-10 of the 1982 Amendment of Lease.
On August 12, 2002, the Slawsbys and Super 88 entered into a second agreement with financial terms essentially identical with the April 30, 2002, agreement. This second agreement, however, eliminated the contingency that Super 88 reach a monetary agreement with the Cifrino interests as to the right of first refusal for 20,000 square feet in the Bradlee property and substituted a contingency that either the Cifrino interests come to agreement that a Super 88 may utilize the Capitol premises or the Slawsbys obtain an order "from a court of competent jurisdiction" that a) a Super 88 is a "supermarket" as permitted in the Lease and b) that

Not Reported in N.E.2d
16 Mass.L.Rptr. 405
(Cite as: 2003 WL 21527602 (Mass.Super.))

the Cifrino interests must honor the right of first refusal for the additional space.

No agreement having been reached between Super 88 or the Slawsbys and the Cifrino interests, this lawsuit followed on March 31, 2003.

On the issue of whether the Super 88 store proposed to acquire the Capitol premises at the Mall at Fields Corner is a supermarket, the Slawsbys presented an expert witness. The witness was Gene Arlin German ("Prof.German"), who holds the position of Robert G. Tobin Professor of Food Marketing, in the Department of Agricultural Economics at Cornell University. Prof. German holds a B.A. degree in Economics from Michigan State University, an M.S. degree in Marketing from Cornell University and a Ph.D. in Marketing also from Cornell. Prof. German is highly qualified and provided competent testimony on issues relating to the United States supermarket industry, including its history and evolution from shortly after WWII to the present.

Prof. German testified--and this Court accepts that testimony--that the current definition in the industry of a supermarket is: "A self-service retail food store, with annual sales of $2 million or more, which contains basic departments offering groceries, meat, fish, produce, dairy products and frozen foods."

*6 Like the Court, Prof. German visited and viewed the South Bay and Allston Super 88 stores. In his opinion--with which this Court, as a lay person, agrees--those stores fit the recognized definition of a "supermarket." The Super 88s are laid out in typical supermarket fashion, with aisles of shelves carrying a wide variety of foods, with a fresh produce section, with a very large rice and grains section, with a meat department, with an extraordinary fresh seafood department, with dairy products and frozen foods. Customers enter at the front and perambulate the aisles and peruse the departments with shopping carts or baskets and serve themselves. The customers then exit through a series of cash register check-out counters, also at the front of the stores.

The only thing noticeably different in Super 88 stores from conventional supermarkets with which

this Court is familiar is the fact that there is a heavy--but by no means total--emphasis on Asian foods and products. There was, however, a clearly discernable difference in the mix of products at the Allston store from that at South Bay. The Allston store had a larger amount of "traditional" American foods, and a considerably larger amount of Hispanic-branded foods than was seen by the Court at South Bay.

In Prof German's opinion, the mix of foods proffered is not the determining factor as to whether a store is a supermarket, so long as there is some general mix of traditional offerings. He described heavily Hispanic-oriented markets in Texas and California, and referenced Bread and Circus stores and Trader Joe's locally, each of which, he said, fit the definition of a supermarket. In Prof. German's opinion, Super 88's Asian emphasis does not exclude it from the industry definition of a supermarket.

## RULINGS OF LAW

Count I and Count IV in this matter present claims appropriate for declaratory relief. See, e.g., *Scirpo v. McMillan,* 355 Mass. 657, 661 (1969); *Kobayashi v. Orion Ventures, Inc.,* 42 Mass.App .Ct. 492, 495 (1997).

The interpretation of an unambiguous agreement is an issue of law for the Court. Contract or lease language must be construed in its usual and ordinary sense. *116 Commonwealth Condominium Trust v. Aetna Cas. & Surety Co.,* 433 Mass. 373, 376 (2001); *Citation Ins. Co. v. Gomez,* 426 Mass. 379, 381 (1998); *President and Fellows of Harvard College v. PECO Energy Company,* 57 Mass.App.Ct. 888, 891 (2003). A lease provision is ambiguous "only if it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one." *Citation Ins. Co., supra,* 426 Mass. at 381. The mere fact that parties disagree on the proper construction of lease language, however, does not necessarily establish ambiguity. *Lumbermans Mut. Cas. Co. v. Offices Unlimited, Inc.,* 419 Mass. 462, 466 (1995).

"The object of the court is to construe the [Lease] as a whole, in a reasonable and practical way,

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in N.E.2d
16 Mass.L.Rptr. 405
(Cite as: 2003 WL 21527602 (Mass.Super.))

Page 6

consistent with its language, background and purpose." *USM Corp. v. Arthur D. Little Systems, Inc.,* 28 Mass.App.Ct 108, 116 (1989). The Court must act in a way to give effect to the Lease as a rational business instrument in order to carry out the intent of the parties. *Starr v. Fordham,* 420 Mass. 178, 192 (1990). Even in the case of an ambiguous agreement, interpretation is a matter of law for the Court. *Gross v. Prudential Ins. Co. of America, Inc.,* 48 Mass.App.Ct. 115, 119 (1999).

*7 Justice, common sense and the probable intention of the parties upon consideration of the words in question are guides to the construction of a written contract or lease. *City of Haverhill v. George Brox, Inc.,* 47 Mass.App.Ct. 717, 720 (1999).

In construing the Lease in issue here, the Court must give effect to the intentions of the parties, as expressed in the language employed, considered in the light of the context of the transaction and the purposes to be accomplished. *Starr, supra,* 420 Mass. at 190; *Shea v. Bay State Gas Co.,* 383 Mass. 218, 224-25 (1981).

"[D]oubts as to restrictions [in a lease] are to be resolved in favor of the tenant." *Mutual Paper Co. v. Hoague-Sprague Corp.,* 297 Mass. 294, 301 (1937).

Here, where both the original Landlord and the original Tenant, all acting through the same members of the Cifrino family and who are sophisticated and knowledgeable parties, chose to embody their agreement for the supermarket tenancy in issue in a detailed and carefully crafted written Lease, perhaps more than in other situations they are entitled to and should be held to the contractual language they chose. The Court itself must be careful not to impose its own views on the contracting parties or to let matters outside the four corners of the instrument modify its expressed statements. "Courts cannot ... [, for example,] use commercial context to override express provisions of a contract." *Plymouth Rubber Co., Inc. v. Insurance Company of North America, Inc.,* 18 Mass.App.Ct. 364, 369 (1984).

In making the declaration sought in Count I, the Court must start with the documents, principally the

Lease and its amendments. Looming very large is Article VII, Section 1, of the Lease. With emphasis added, it reads in material part:

> The portion of the demised premises marked "Supermarket" on said Exhibit A shall be used only for the conduct thereon of *a supermarket business,* which business *may* include the sale of such items as are presently sold, *or as may be sold from time to time* by Tenant in its stores, or by *its competitors or any of them conducting similar businesses.*

The Court can only look to the words used in the Lease documents in the context in which they are used. This is because, among other things, the drafters of the Lease and those who first executed it included a broadly worded integration clause in Article XVIII, Section 14, that reads in material part:

> This instrument contains the entire and only agreement between the parties, and no oral statements or representations or prior written matter not contained in this instrument shall have any force or effect.

Thus any oral statements of the parties, or others, as to their understanding of the meaning of the words chosen ought not be considered.

Although the word "supermarket" is not defined in the Lease, it is essentially one of those self-defining words that needs no assistance from a draftsman, unless, of course, what was intended was something different from what the ordinary definition might include. A current dictionary definition, for example, is: "A departmentalized self-service chain or independent retail market that sells foods, convenience goods, and household merchandise arranged in open mass display." Webster's Third New International Dictionary (c.1986). There is no limiting language in the Lease, nor is there any ambiguity. See, by way of contrast, *Kobayashi, supra,* 42 Mass.App.Ct. at 496.

*8 In this context, the Court observes that this Lease, as amended, contemplated a life-span of 80 years. And the business in issue operated within a dynamic and evolving industry. Consequently, it would be legally inappropriate for this Court to read the Lease language to be frozen in time as of the date of its execution in 1965. The "supermarket business" as referenced in Article VII, Section 1, is not said to be so petrified. The very clause in issue

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in N.E.2d
16 Mass.L.Rptr. 405
(Cite as: 2003 WL 21527602 (Mass.Super.))

includes language referring to "such items as are presently sold, or as may be sold from time to time," and that reference is not limited just to what is sold from time to time at the premises. It also includes what is sold from time to time "by any [competitors] conducting similar businesses."

It seems significant to the Court that the language just discussed--and which the defendants suggest is such as would limit the definition to a "conventional" supermarket--begins with the words "may include," not "shall include." Can the use of the word "may" be said to mandatorily modify or limit the preceding phrase, "a supermarket business?" The draftsman of the Lease could readily and easily have said: "The premises shall be used only for the conduct thereon of a conventional supermarket business of the kind being operated on the date of the execution of this Lease, as such business may itself evolve over the term hereof," or other similar limiting language. The draftsman, however, chose not to provide such a narrow constraint on the Tenant. This Court is disinclined to insert such a limitation as well. "[T]he proper course is to enforce contracts according to their plain meaning and not to undertake to be wiser than the parties, and therefore ... they will be taken to mean what they say and will be held to their word." *Guerin v. Stacy*, 175 Mass. 595, 597 (1900) (Holmes, C.J.).

Nor should it pass without notice that nowhere in the Lease, or any amendment thereof over the first nearly 40 years of its existence, has the Landlord insisted upon, or been given, any right or authority to dictate to the Tenant its product mix, the kinds or ethnicity of the products it would sell, the percentages of shelf-space or floor-space for any particular products, or in any other way to interfere with the Tenant's choices in connection therewith.

The Super 88 stores in South Bay and Allston that this Court observed on the view are each "a supermarket business" as that phrase is used in Article VII, Section 1, of the Lease. There is nothing in the Lease, or any amendment thereto, that warrants a different conclusion or ruling. As a consequence, the Slawsbys do not need the Landlord's assent to a transfer of their stock in Capitol to an entity that intends to run a Super 88 supermarket like that seen on the view in Allston.

The October 11, 2000, letter from Paul Cifrino to Stanley Slawsby regarding the "first refusal on up to 20,000 feet of the area currently occupied by Bradlee for expansion of the Capitol Food store area" was an option. "An option is simply an irrevocable offer creating a power of acceptance in the optionee ... Therefore, no duty to perform arises in the optionor until the optionee accepts the irrevocable offer embodied in the option." *Stapleton v. Macchi*, 401 Mass. 725, 729 n. 6 (1988). See also, *The Tristram's Group, Inc. v. Morrow*, 22 Mass.App.Ct. 980, 981 (1986).

*9 "An option given without consideration [, however,] is revocable at any time by the offeror." *Pearl v. Merchants-Warren National Bank of Salem*, 9 Mass.App.Ct. 853, 854 (1980).
  The essentials of consideration are summarized in Williston, Contracts (3d ed.) sec. 102A: "[Legal detriment] means giving up something which immediately prior thereto the promisee was privileged to retain, or doing or refraining from doing something which he was privileged not to do, or not to refrain from doing. Benefit correspondingly must mean the receiving as the exchange for his promise of some performance or forbearance which the promisor was not previously entitled to receive."
*Graphic Arts Finishers, Inc. v. Boston Redevelopment Authority*, 357 Mass. 40, 42-43 (1970).

Neither the Slawsbys, nor Capitol, in return for the October 11, 2000, letter from Paul Cifrino, gave up something which immediately prior thereto they were privileged to retain, or did or refrained from doing something which they were privileged not to do, or not to refrain from doing. Nor did Paul Cifrino, or the Trust, receive as the exchange for his letter some performance or forbearance which he was not previously entitled to receive.

In short, in the traditional sense, there was no consideration for the October 11, 2000, letter.

The Slawsbys argue, however, that the doctrine of promissory estoppel can serve as a substitute for traditional consideration in support of an option contract. They cite to Restatement (Second) of Contracts, Sec. 87(2), which reads: "An offer which the offeror should reasonably expect to induce

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in N.E.2d
16 Mass.L.Rptr. 405
(Cite as: 2003 WL 21527602 (Mass.Super.))

action or forbearance of a substantial character on the part of the offeree before acceptance and which does induce such action or forbearance is binding as an option contract to the extent necessary to avoid injustice."

The Slawsbys also cite to three cases in support of their position. *Teitelbaum v. Hallmark Cards, Inc.,* 25 Mass.App.Ct. 555 (1988); *McAndrew v. School Committee of Cambridge,* 20 Mass.App.Ct. 356 (1985); and *Greenstein v. Flatley,* 19 Mass.App.Ct. 351 (1985).

Unfortunately, there is no credible evidence that the Slawsbys, or Capitol, took any action whatsoever as a result of receiving the October 11, 2000, letter. Any upgrading of the store occurred before the letter was ever discussed, and any moneys that the Slawsbys themselves may have lent to Capitol were because of their interest in preserving the store for their son Stuart, and provided no benefit whatsoever to Paul Cifrino or the Trust. In short, there is nothing upon which to predicate a ruling of a substitute for consideration on a promissory estoppel theory.

For what little it may be worth, this Court finds and rules that the October 11, 2000, letter was not limited to Stanley Slawsby personally. It expressly recites that the first refusal is "offer[ed to] your Capitol Food store." Further, there is no express prohibition against assigning the option, and consequently, if it has not been impaired for lack of consideration and the revocable nature that that situation permits, it could be assigned to an appropriate successor. See, e.g., *American Employers' Ins. Co. v. Medford,* 38 Mass.App.Ct. 18, 22 (1995).

## ORDER FOR JUDGMENT

**\*10** Based upon the foregoing findings of fact and rulings of law, this Court orders judgment for the plaintiffs on Count I of the complaint and judgment for the defendants on Count IV of the complaint, and directs that the following declarations and injunctive order be entered as part of the judgment:

1. A Super 88 Market, such as that at or near the intersection of Commonwealth Avenue and Brighton Avenue, in the Allston section of Boston, is a "supermarket" within the meaning

and constraints of Article VII, Section 1, of the Indenture of Lease dated January 7, 1965, by and between Paul J. Cifrino, John P. Cifrino and James P. Cifrino, Trustees of Fields Station Realty Trust, as Landlord, and Supreme Fields Corner, Inc. as Tenant, as such Lease has been amended by amendments dated February 1, 1968, January 8, 1982 and November 13, 1985;

2. The plaintiffs and their successors do not have an irrevocable right to exercise the right of first refusal for up to 20,000 square feet of space adjacent to the Capitol Supermarket at 500 Geneva Avenue, in the Dorchester section of Boston, as set forth in the letter dated October 11, 2000, from Paul Cifrino to Stanley Slawsby, solely for the reason that there is no consideration, or substitute for consideration, for the option appearing in such letter; and

3. The defendants are enjoined and restrained from terminating the Lease for the supermarket premises at 500 Geneva Avenue, in the Dorchester section of Boston, or otherwise from interfering with the tenant's use of the Premises (i) as a Super 88 Market, such as that at or near the intersection of Commonwealth Avenue and Brighton Avenue, in the Allston section of Boston, (ii) as a supermarket that emphasizes and concentrates in the sale of Asian foods, or (iii) due to any change by Capitol of its product line, so long as Capitol remains a self-service retail food store, with annual sales of $2 million or more, which contains basic departments offering groceries, meat, fish, produce, dairy products and frozen foods, regardless of the ethnic or geographic orientation of the products sold thereat.

The parties are requested to confer and advise the Court whether either of them desires a determination and direction by the Court pursuant to Mass.R.Civ.P. Rule 54(b), together with a Report to the Appeals Court pursuant to Mass.R.Civ.P. Rule 64. If not, then the Court seeks the parties' desires regarding the resolution of the remaining counts of the complaint.

16 Mass.L.Rptr. 405, 2003 WL 21527602 (Mass.Super.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works