UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.: 4:04-CV-40149

| | | |
|---|---|---|
| HOLDEN COMMONS, LLC., | ) | **MEMORANDUM OF LAW** |
| Plaintiff | ) | **IN OPPOSITION TO** |
| | ) | **PLAINTIFF'S MOTION FOR** |
| vs. | ) | **PRELIMINARY INJUNCTION** |
| | ) | |
| BIG Y FOODS, INC., | ) | |
| Defendant | ) | |

Defendant, Big Y Foods, Inc. ("Big Y") submits its Memorandum of Law in Opposition to the Plaintiff, Holden Commons, LLC's ("Holden"), Motion for Preliminary Injunction. In support thereof, Big Y attaches Affidavit of Charles L. D'Amour, and states as follows:

## I.  INTRODUCTION

This action arises out of a commercial lease between Big Y and Holden in which Big Y owns and operates a supermarket (the "Premises") in a shopping center located in Holden, Massachusetts (the "Shopping Center'). Plaintiff, Holden, has filed a Complaint seeking Injunctive Relief, Declaratory Relief and an award of attorney's fees and costs. Holden seeks to enjoin Big Y from opening and operating a pharmacy at the Premises. Big Y opposes Holden's Motion.

## II.  STANDARD OF REVIEW

The First Circuit has articulated a standard of review for the granting of Preliminary Injunctions. Under this standard the Court must look to four elements in determining the appropriateness of a Preliminary Injunction. "The court has crafted a four-part framework for use in determining whether the grant or denial of preliminary injunctive relief is appropriate. Under

this formulation, trial courts must consider (1) the likelihood of success on the merits; (2) the potential for irreparable harm if the injunction is denied; (3) the balance of relevant impositions, that is, the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect, if any, of the court's ruling on the public interest." <u>Ross-Simons of Warwick, Inc. v. Baccarat, Inc.,</u> 102 F.3d 12 (1st Cir. 1996); <u>Ocean Spray Cranberries, Inc. v. Cheney,</u> 160 F.3d 58, 60-61 (1st Cir. 1998). ("Massachusetts standards for a preliminary injunction do not seem markedly different" from the Federal standard for purposes of a diversity Court's application of Massachusetts law.)

Plaintiff's request for a preliminary injunction must fail because they have failed to meet the burden imposed by the four-part test set forth in <u>Ross-Simons of Warwick, Inc.</u>  In particular, Holden has failed to establish its likelihood of success, that any injury it may suffer is irreparable or that monetary damages may not redress any injury it might suffer, that the balance of hardships weighs in its favor, and that the entry of a preliminary injunction is in the public interest.  It bears noting that Holden fails to present this Court with any affidavit or verified pleading in support of its Motion. See Local Rule 7.1(B)(1).  Accordingly, this Court should deny the extraordinary injunctive relief that they seek.

### III. FACTS

The Affidavit of Charles L. D'Amour filed herewith, sets forth the following facts:

1. Big Y is a Massachusetts corporation with its home office located in Springfield, Massachusetts.  Big Y owns and operates a chain of fifty (50) supermarkets in Massachusetts and Connecticut.  See Affidavit of Charles L. D'Amour at paragraph 2.

2. Big Y entered into a long-term lease (the "Lease") with Reservoir Realty Trust ("Reservoir") on April 15, 1988 for the Premises. Big Y has operated a supermarket at

the Premises since such time.  Holden assumed Reservoir's interest under the Lease in 1999. The Lease has been amended twice, once to expand the square footage and a second time to adjust the rent and extend the term of the Lease.  The Lease provides Massachusetts law will govern any disputes over the interpretation of the Lease.  Lease at section 34(d), page 53.  Id. at 3.

3. Prior to 1987, supermarkets in other states, including Stop & Shop, Edwards Warehouse, First National Stores, Walbaum's, Pathmark and Shop-Rite, customarily operated pharmacies selling prescription drugs on their premises.  Since 1987, it has been the custom for supermarkets in Massachusetts to operate pharmacies selling prescription drugs on their premises.  Id. at 4.

4. The Lease provides, in pertinent part, as follows:

"2. Term and Options to Extend. (b) *** Notwithstanding anything contained above to the contrary, Lessee shall not be required to open for business, nor shall the Commencement Date be deemed to have occurred until such time as Lessor has executed leases for at least seventy-five percent (75%) of the available leaseable square footage in the Shopping Center including one such store being a drugstore with a pharmacy being operated by a regional major chain.  Lessee, at its option, may waive the contingency contained in this clause.

***

5. Use.  Lessee agrees to use the premises for the initial purpose of operating a store commonly known as a supermarket selling merchandise customarily carried in supermarkets.  "Supermarket" shall mean a store similar in operation to Stop & Shop, Edwards Warehouse, First National Stores, Waldbaum's, Pathmark and Shop-Rite, operating as a conventional supermarket or warehouse-type supermarket.  Lessee may elect to change the use of the premises for any lawful purpose provided that at the time of such change in use there is not then a competing business located within the Shopping Center and further provided that it obtains the consent of Lessor, which consent shall not be unreasonably withheld or delayed.  If Lessee fails to consent to such changed use the Lessor shall have the option to terminate this Lease and release Lessee from further liability hereunder.

***

6. <u>Restrictions on Use</u>. (a) The Lessor will not lease, rent or permit to be occupied by any person any part or the whole of any premises owned, leased or controlled by Lessor, its stockholders, officers, directors or employees located wholly or partially either within the entire premises, or within a distance of five (5) miles from any portion of the premises described in Exhibit "A" for the sale of groceries, meat, fish, fruits, vegetables, food products and food supplies of any kind, at wholesale or retail or for off premises consumption, with the exception of the normal drug store, smoke shop, book or newsstand shop counter items such as potato chips, crackers, soda, candy, gum, cigars, or cigarettes; with the exception of a restaurant or ice cream shop which would have take-out service and with the exception of a convenience store which is not in excess of 5,000 square feet."

Lease at section 2, pages 3-4 and sections 5,6, pages13-15 (emphasis added). <u>Id</u>. at 5.

5. Holden leases retail space in the Shopping Center to Consumer Value Stores ("CVS").

CVS operates a retail store at the Shopping Center, which, upon information and belief, sells various goods such as food, milk, soda, ice cream, stationary, health and beauty products, as well as prescription drugs. <u>Id</u>. at 6.

6. It was the intention of the parties to keep the definition of the term "supermarket," as set forth in the Lease, current within the supermarket industry. <u>Id</u>. at 7.

7. Big Y was not on notice of restrictive covenants in the CVS lease at the time it was executed. <u>Id</u>. at 8.

8. Big Y intends to open a pharmacy department at the Premises in or about November 2004. <u>Id</u>. at 9.

9. A Stop & Shop, which is 4.2 miles from the Premises, currently maintains a pharmacy department on its premises. <u>Id</u>. at 10.

10. During its tenancy, Big Y has sold a variety of items, including but not limited to food, health and beauty aids, newspapers, cigarettes, and prepared foods. Holden has never attempted to restrict Big Y's sale of such items. <u>Id</u>. at 11.

4

## IV. ARGUMENT

The Plaintiff has not met the standard for granting a preliminary injunction. In order to succeed on a preliminary injunction motion, the Plaintiff bears the burden of showing that (1) it has a likelihood of success on the merits, (2) there exists, absent the injunction, a significant risk of irreparable harm, (3) the balance of hardships tilts in its favor, and (4) granting the injunction will not adversely affect the public interest. See Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12 (1st Cir. 1996).

### A.   PLAINTIFF HAS FAILED TO ESTABLISH THAT IT IS LIKELY TO SUCCEED ON THE MERITS.

The Plaintiff cannot succeed on the merits for three principle reasons: (1) The Lease and its Amendments do not restrict Big Y from operating a pharmacy, (2) Big Y has not changed its use of the Premises, and (3) Big Y is not bound by any restrictions that Holden has negotiated with other tenants at the Shopping Center.

### 1.   THE LEASE AND ITS AMENDMENTS DO NOT RESTRICT BIG Y FROM OPERATING A PHARMACY.

The language of the Lease does not restrict Big Y from operating a pharmacy department. Importantly, the Lease specifies that Big Y agrees to use the Premises "for the initial purpose of operating a store commonly known as a supermarket selling merchandise customarily carried in supermarkets." Lease at section 5, page 13. The usage of the word "initial" evinces the parties' intention to ensure that the definition of the term "supermarket" remained current with the industry. Not only were prescription drugs and pharmacy departments found in supermarkets in Massachusetts at the time the Lease was executed, but pharmacy departments were customarily

found in supermarkets in other states prior to the date the Lease was executed. See Affidavit of Charles L. D'Amour at paragraph 4.

The Lease provides that, "'Supermarket' shall mean a store similar in operation to Stop & Shop, Edwards Warehouse, First National Stores, Waldbaum's, Pathmark and Shop-Rite . . . ." Lease at section 5, page 13. Prior to 1987, all such supermarket chains maintained stores in other states that included pharmacy departments. In this regard, the Lease reflects that the Premises would be similar in use to supermarkets customarily containing pharmacy departments at the time the parties executed the Lease. Moreover, the Lease does not freeze the comparison of Big Y to the above-recited supermarkets to 1988. See Affidavit of Charles L. D'Amour at paragraph 4 and paragraph 5.

Massachusetts case law supports Big Y's contention that the definition of the term "supermarket," as set forth in the Lease, remained dynamic. In Slawsby v. Cirfino, 16 Mass. L. Rep. 465 at 8, the Massachusetts Superior Court stated that the supermarket at issue "contemplated a life-span of eighty years. And the business at issue operated within a dynamic and evolving industry. Consequently it would be legally inappropriate for this Court to read the lease language to be frozen in time as of the date of its execution in 1965. The 'supermarket business' as referenced in Article VII, Section 1 [of the parties' lease], is not said to be so petrified." Id. Similarly, the Lease and its Second Amendment contemplate a term of twenty-five (25) years in addition to four (4) option periods of five (5) years each. As such, the parties' usage of the term "initial" reflects that, over twenty-five (25) to forty-five (45) years, the parties intended to ensure that Big Y's use of the Premises remained dynamic within trade and custom.

Custom within the industry does not constrain Big Y's usage of the Premises to preclude the opening of a pharmacy. Indeed, supermarkets were authorized to operate pharmacies at their

locations at the time the Lease was executed.  See M.G.L. c. 112 §§38, 39.  As in Slawsby, this

Court should be disinclined to insert a limitation into the Lease precluding Big Y from operating

a pharmacy.  See Slawsby, supra, at 8, citing Guerin v. Stacy, 175 Mass. 595, 597 (1900) ("[t]he

proper course is to enforce contracts according to the plain meaning and not to undertake to be

wiser than the parties, and therefore . . . they will be taken to mean what they say and will be

held to their word." Id.)

Absent any ambiguity, this Court should construe the language of the Lease in its usual

and ordinary sense.  See 116 Commonwealth Condominium Trust v. Aetna Causualty & Surety

Co., 433 Mass. 373, 376, 742 N.E.2d 76 (2001).  This Court should not resort, however, to a

dictionary definition of the term "supermarket" as Holden suggests.  See Slawsby, supra at *5.  It

is for a fact finder to determine the meaning of the language the parties negotiated.  See

Kobayashi, supra, 42 Mass. App. Ct. at 497.  In Kobayashi, the Court stated it is the object of the

fact finder at trial "to ascertain the meaning intended to be attached to the words by the parties

who use them . . . ." Id. "The finder-of-fact may extract the intended meaning . . . for purposes

of the documents, from the circumstances that led to its use."  Id.  While dictionary definitions

may be of some utility to a finder-of-fact, such terms are not dispositive.  As stated in Kobayashi,

"dictionary definitions [have] only marginal relevance to what was in the minds of businessmen

and lawyers pragmatically hammering out a lease."  Id. at 498.

Where ambiguity does appear in a lease, however, this Court should consider "the entire

instrument and the general scheme it reveals to determine the significance and meaning of the

ambiguous terms."  McDonald v. Gough, 326 Mass. 93, 96, 93 N.E.2d 260 (1950).  "The object

of the [Court] is to construe [Lease] as a whole in a reasonable and practical way, consistent with

its language, background on purpose."  USM Corp. vs. Arthur D. Little Systems, Inc., 28 Mass.

App. Ct. 108, 116, 546 N.E.2d 888 (1989). In cases where there is an absence of clear language in a lease indicating a restriction in use, "the tenant has a right to use the premises for any lawful purpose for which they are adapted." <u>Mutual Paper Co. v. Hoague-Sprague Corp.</u>, 297 Mass. 294, 301, 8 N.E.2d 802, 807 (1937). Indeed, "When the lessor cannot show a use of the premises inconsistent with the terms of the lease, the lessee's right of full enjoyment will not be restricted." <u>Id</u>. "In order to establish a restriction, express language or language from which a restriction is clearly implied must be shown, since equity does not favor raising by implication a covenant restraining the beneficial use of property." <u>Id</u>.

To the extent this Court deems the Lease ambiguous in relation to the issue presented, Holden's Motion for Preliminary Injunction should be denied. The interpretation of an ambiguous agreement is not strictly a matter of law. To the extent an ambiguous agreement may turn on facts in genuine dispute, the interpretation of an ambiguous agreement involves resolution of factual issues. See <u>Gross v. Prudential Insurance Company of America, Inc.</u>, 48 Mass. App. Ct. 115, 119, 17 N.E.2d 383 (1999). Regardless, "doubts as to restrictions [in a lease] are to be resolved in favor of the tenant." <u>Mutual Paper Co.</u>, <u>surpra</u> at 301.

a.   <u>Lease Provisions Relating To Restrictions On Use Are Not Dispositive Of Whether The Parties Intended To Restrict Big Y From Operating A Pharmacy</u>.

The Lease provision relating to Holden's restrictions on leasing certain businesses is not dispositive of whether Holden may restrict Big Y from operating a pharmacy at the Premises. In this regard, the Lease provides at section 6, page 14 as follows: "6. <u>Restrictions on Use</u>. (a) The Lessor will not lease, rent or permit to be occupied by any person any part or the whole of any premises owned, leased or controlled by Lessor . . . within a distance of five (5) miles from any portion of the premises . . . for the sale of groceries, meat, fish, fruits, vegetables, food products

and food supplies of any kind . . . with the exception of the normal drug store, smoke shop, book or newsstand shop counter items such as potato chips, crackers, soda, candy, gum, cigars, or cigarettes . . . ." Id. Such restriction upon Holden does not demonstrate that Big Y agreed to restrict itself from the sale of prescription drugs. Indeed, the list of items identified in section 6 is not exhaustive. For example, Big Y has sold a variety of items, including but not limited to health and beauty aids, newspapers, cigarettes, and prepared foods which are not identified in such clause. See Affidavit of Charles L. D'Amour at paragraph 11. Holden has never attempted to restrict Big Y's sale of such items, regardless of the existence of a competing business located within the Shopping Center.

Moreover, the Plaintiff incorrectly attempts to distinguish prescription drugs from other items to the extent that a special license is required for prescription drug sales. Other items which supermarkets sell likewise require a license for sale. For example, supermarkets are required to obtain special licenses to sell milk, cigarettes and alcohol. The sale of prescription drugs is no different from the sale of other such merchandise.

2.    BIG Y HAS NOT CHANGED ITS USE OF THE PREMISES.

Big Y has always maintained the right to operate a pharmacy at the Premises. The plain language of the Lease grants Big Y the right to operate a supermarket carrying all the merchandise which supermarkets customarily carry. On November 3, 1987, prior to the execution of the Lease, the Massachusetts Legislature amended M.G. c. 112 §§38, 39 to allow supermarkets to obtain the necessary permits to operate pharmacies on their premises. Indeed, prior to 1987, supermarkets in other states, such as Stop & Shop, Edwards Warehouse, First National Stores, Waldbaums, Pathmark and Shop-Rite, customarily operated pharmacies on their premises. See Affidavit of Charles L. D'Amour at paragraph 4. Since 1987, it has been the

custom for supermarkets in Massachusetts to operate pharmacies on their premises. See Affidavit of Charles L. D'Amour at paragraph 4. Hence, Holden's argument that the opening of a pharmacy at the Premises constitutes a "competing business" is without merit.

3.   BIG Y IS NOT BOUND BY RESTRICTIONS BETWEEN HOLDEN AND CVS.

Big Y is not bound by restrictive covenants between Holden and CVS. In this regard, the CVS lease was executed after Big Y and Holden executed the Lease. Big Y was not on notice of any restrictions which Holden negotiated with CVS. See Affidavit of Charles L. D'Amour at paragraph 8.

It is well-settled that a tenant without such notice is not bound thereby. "After the landlord has given the covenant to one tenant, a subsequent tenant is bound thereby only if he has notice of the restriction, and then only if he had the notice before execution of his lease. A tenant who is charged with notice, by reason of a lease to a prior tenant, is not chargeable with notice of terms added in a renewal of the prior lease, where the renewal is made after his lease." Friedman on Leases §28.601; Norwood Shopping Center, Inc. v. MKR Corp., 135 So.2d 448 (1961) (the Court held that a restrictive covenant in one lease could not affect a prior lessee's use of the premises, even if an action taken by the prior lessee violates the restrictive covenant contained in the second lease, because the prior lessee did not have actual notice of the restriction); Farmers and Mechanics Saving Bank, et al v. First Federal Savings and Loan Association of Meriden, et al, 167 Conn. 294 (1974) (the Court held that ". . . it appears to be the majority view that a prior lessee, acting in conformity with the terms of it's lease is not bound by a restrictive covenant subsequently enacted between the lessor and another lessee, and, under such circumstances, injunctive relief to enforce such a covenant against the prior lessee is properly denied." (Id. at 300); James L. Fox et al. v. Robert J. Congel et al., 75 A.D.2d 681

(1980) (Mall landlord leased retail space to an athletic store in violation of another tenants lease, but subsequent tenant did not have notice of the restriction.)

If Holden intended to grant an exclusive right to CVS to operate a pharmacy at the Shopping Center, such restriction would not be binding upon Big Y unless Big Y was on notice prior to executing the Lease. Accordingly, the Lease clause requiring the opening of a "regional major chain drug store with a pharmacy" does not create a restriction precluding Big Y from operating a pharmacy. See Lease at section 2(b), page 4. Query, why would Big Y agree to such a restriction? To the extent CVS' tenancy were terminated, Big Y would be left with an unnecessary restriction.

It is immaterial that the Lease required a regional chain drug store to become a tenant at the Shopping Center. See Affidavit of Charles L. D'Amour at paragraph 5. If the parties intended to preclude Big Y from operating a pharmacy department, such a restriction should have been set forth in the Lease. At the very least, Reservoir or Holden failed to seek an amendment to the Lease adding such a restriction.

Plaintiff has failed to establish a likelihood of success on the merits. Big Y has always had the right to operate a pharmacy at the Premises according to the terms of the Lease. Accordingly, Big Y is not changing its use of the Premises and does not require Holden's consent to open a pharmacy department. Further, the Lease contemplates the "initial purpose" of operating a supermarket was to be dynamic and flexible. Lastly, the Lease predates the CVS lease, and, therefore, Big Y was not on notice that Holden's predecessor, Reservoir, had granted CVS the exclusive right to operate a pharmacy in the Shopping Center. Based on the foregoing reasons the Plaintiff cannot demonstrate that it has a likelihood of success on its complaint, and, therefore, a preliminary injunction should not be granted.

11

**B.**  **THE PLAINTIFF HAS FAILED TO SHOW THAT IT WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF AN INJUNCTION.**

1.  MONETARY RELIEF IS AVAILABLE TO HOLDEN.

Even were Holden able to demonstrate a likelihood of success on the merits, it cannot show that it will suffer irreparable harm in the absence of an injunction. In this regard, no preliminary injunction should issue because monetary relief is available to Holden. Cases construing the right to preliminary injunctive relief have repeatedly held that "[t]here can be no irreparable harm where only money is at stake." Foxboro Co. v. Arabian American Oil Co., 805 F.2d 34, 36 (1st Cir. 1986), citing Itek Corp. v. First Nat'l Bank, 730 F.2d 19, 22 (1t Cir. 1984). See also K-Mart Corporation v. Oriental Plaza, Inc., 875 F.2d 907 at 914. (". . . if money damages will fully alleviate harm, then the harm cannot be said to be irreparable.") Al Cass, Inc., v. Cassinelli, 1999 Mass. Super. LEXIS 50 (denying preliminary injunction even though plaintiff established high likelihood of trademark infringement); Subaru of New Eng. v. Subaru of Wakefield, 7 Mass. L. Rep. 425 (1997) (Doefer, J.), citing Hull Mun. Lighting Plant v. Massachusetts Mun. Wholesale Elec., 399 Mass. 640, 643, 506 N.E.2d 140 (1987); Montague Corp. v. Simon Worldwide, 2001 Mass. Super. LEXIS 43 (Lauriat, J.), quoting Hull Municipal Lighting Plant, supra, at 640, 643, 506 N.E.2d 140 (1987). K-Mart Corporation, supra, which Holden relies upon, is distinguished from the within matter. In K-Mart, the Court found that plaintiff's damages involved detriment in the "presentation of the store to the public." thereby detracting from K-Mart's desired uniformity in appearance among its stores across the nation. Id. at 915. Indeed, K-Mart's store presence was negotiated in agreeing to the lease between K-Mart and its landlord. Id at 915. An intangible such as store presentation may be susceptible to the granting of equitable relief. Such intangible damage is not present herein, nonetheless.

Holden ratifies that its lease with CVS provides specific monetary remedies available to CVS if Holden breaches the exclusivity clause of its lease. Hence, injunctive relief is not appropriate in the within matter. See Kobayashi v. Orion Ventures, 42 Mass. App. Ct. 492, 493 (1997). In Kobayashi, the Massachusetts Appeals Court upheld a jury verdict for monetary damages for a tenant and ruled that damages may include prospective profit to the extent that such profit is susceptible or proven within a reasonable degree of certainty, yet short of mathematical exactness. Id. at 500 citing Lowrie v. Castle, 225 Mass. 37, 51-52, 113 N.E.2d 206 (1916); Augat, Inc. v. Aegis, Inc., 417 Mass. 484, 488, n. 4, 631 N.E.2d 995 (1994); Frank D. Wayne Associates, Inc. v. Lussier, 16 Mass. App. Ct. 986, 988, 454 N.E.2d 108 (1983); Blakeley v. Gorin, 365 Mass. 590, 313 N.E.2d 903 (1974) (Restriction in deed forbidding encroachment on alley in order to preserve light and air to neighboring landowners would not be specifically enforced in order to prevent construction of bridging structure between apartment hotel complex and existing hotel whereas the beneficiaries of restriction would be relegated to recovering money damages.)

Massachusetts law generally favors the imposition of monetary damages over injunctive relief. In particular, M.G.L. c. 184 §30 (5) provides that injunctive relief cannot be granted if "enforcement, except by award of money damages, is for any other reason inequitable or not in the public interest." Id. Massachusetts law is, hence, consistent with settled principles of equity jurisprudence. This Court should not employ the extraordinary relief Holden requests whereas monetary damages are available to redress any alleged harm to Holden.

2. **HOLDEN'S CLAIM OF DAMAGE TO OTHER BUSINESSES IN THE SHOPPING CENTER IS SPECULATIVE.**

Holden speculates that, in the event that CVS exercises its option to terminate the lease and vacate, CVS' action "would call into question the viability of other businesses who rely on the foot traffic generated by CVS." Plaintiff's Memorandum of Law at page 8. Any calculation of the degree to which other tenants at the Shopping Center rely upon foot traffic CVS generates is purely speculative. This Court should reject such speculation, as did the Court in Deborah Ciolfi, Trustee of Y&M Realty Trust v. Boston Chicken, Inc., et al. 1997 Mass. Super. LEXIS 231 (1997). (Wherein the Court rejected the Landlord's request for an injunction to keep Boston Chicken from early termination of lease citing adverse effect on other tenants of the shopping center.) See also John R. Allen vs. R.K. Associates, Inc., Massachusetts Appeals Court, Docket No. 04-J-344, a copy of said opinion is attached hereto as "Exhibit A." In John R. Allen, the Massachusetts Appeals Court overturned a Superior Court grant of a preliminary injunction relating to the opening of a Panera Bread Bakery & Café within the same shopping center as a Subway Shop. In John R. Allen, the Appeals Court found the information compiled by the moving party (a Subway Shop) to be "foundationally inadequate to demonstrate the economic end (e.g., the ultimate irreparable harm to) Subway, if a preliminary injunction is not granted." Id. citing Hull Municipal Lighting Plant, supra at 643. Regardless of the speculative nature of Holden's assumptions, any damages Holden may seek relating to other tenancies at the Shopping Center are monetary in nature.

The Plaintiff has failed to show it will suffer an irreparable injury in the absence of a preliminary injunction. If, and when, the Plaintiff is able to demonstrate any liability and consequent injury, the remedy available is monetary in nature.

14

**C.**   **THE PLAINTIFF HAS FAILED TO SHOW THAT IT WILL SUFFER A GREATER HARM IF THE PRELIMINARY INJUNCTION IS NOT GRANTED THAN BIG Y WILL SUFFER IF THE PRELIMINARY INJUCNTION IS GRANTED.**

The Plaintiff has failed to demonstrate that it will suffer a greater harm than Big Y if the preliminary injunction it seeks is not granted. If the injunction is granted, Big Y will stand to lose the time, effort and money it has expended in renovating a portion of the Premises in order to accommodate a pharmacy department. Big Y likewise stands to lose the potential revenue which the pharmacy department will generate, as well as a competitive advantage over other supermarkets in the area which do offer a pharmacy service to their customers.

Any injury Holden suffers is borne of its predecessor's actions. The CVS lease was executed after the Lease. Reservoir was aware of both the exclusivity provision set forth in the CVS lease, as well as the terms and conditions of the Lease. As such, Holden knew, or should have known, that the exclusivity clause granted to CVS might be in conflict with the Big Y Lease. In light of Holden's and Reservoir's actions herein, the balance of equities favors denying its request for a preliminary injunction. In this regard, Courts have often looked disfavorably on harm to a party that was of its own doing. See Ardito v. City of Providence, 263 F. Supp. 2d 358, 372-373 (2003); "When one or two innocent parties must suffer, the loss should fall upon the party who caused it rather than upon the other who had no agency in producing it and could not by any means avoided it." Farmers, supra, 167 Conn. 294, quoting Grissell v. Housatonic R.Co., 54 Conn. 447 (1886). Indeed, Holden should be precluded from petitioning the Court to correct its own error.

15

**D.    GRANTING THE INJUNCTION WOULD BE AGAINST PUBLIC INTEREST.**

1.    GRANTING THE INJUNCTION SERVES NO PUBLIC INTEREST.

Granting the Plaintiff's Motion for a Preliminary Injunction would run counter to a long-standing principle that "...the enforcement of contracts by injunction is the exception rather than the rule." Ocean Spray Cranberries, Inc., v. PepsiCo, Inc., 160 F.3d 58 at 61. This Court must consider the risk of harm to the public interest in evaluating the Plaintiff's request for an injunction. Hull Municipal Lighting Plant, supra, at 643; Brookline v. Goldstein, 388 Mass. 443, 447 (1983), citing Bettigole v. Assessors of Springfield, 343 Mass. 223, 237 (1961). In particular, the Court must look to the risk of harm to the public interest in cases in which the moving party seeks to restrain ordinary competition. Whitinsville Plaza, Inc. v. Kotseas, 378 Mass. 85, 102, 390 N.E.2d 243 (1979). M.G.L. c. 184 §30 provides that a Court should refrain from enforcing any restrictive covenant that "is for any other reason inequitable or not in the public interest." M.G.L. c.184 §30 (5). Indeed, a restrictive covenant that protects a party from ordinary competition does not serve a legitimate business interest. See Marine Contractors Co. v. Hurley, 365 Mass. 280, 287-88, 310 N.E.2d 915 (1974); Richmond Bros., Inc. v. Westinghouse Broadcasting Co., 357 Mass. 106, 111, 256 N.E.2d 304 (1970) (referring to employee non-competition agreement).

2.    TRIAL CAN BE HAD ON THE MERITS BEFORE THE HARM IS SUFFERED.

Rather than enter a Preliminary Injunction, the within matter could be set down for a one or two day non-jury trial upon an expedited discovery schedule. Trial can be joined with the preliminary injunction hearing. Fed.R.Civ.P. 65(b); Packaging Industries Group v. Cheney, supra, 380 Mass. at 616. "[T]he risk that a party will suffer irreparable harm during the time between the hearing on the preliminary injunction and final adjudication on the merits may be

minimized by consolidating the trial on the merits with the preliminary hearing, as authorized by Mass.R.Civ.P. 65(b) (2), 365 Mass. 833 (1965)." Id. "Irreparable harm is absent if trial on the merits can be conducted before the injury occurs." Packaging Indus. Group, Inc. v. Cheney, 380 Mass. 609, 617 n.11 (1980), citing 11 C.A. Wright & A.R. Miller, supra, §2948, at 431-441.  See John R. Allen, supra, ("In addition, the prospect of economic harm to Subway can be reduced by accelerating the case for disposition (as was requested by the Defendant R.K.- - and apparently opposed by Subway) including but not limited to by an expedited and consolidated trial on the merits pursuant to Mass.R.Civ.P.65(b)(2).").

## V.  CONCLUSION

Holden has failed to meet it Rule 65 burden.  For the reasons set forth above, Big Y respectfully requests Holden's Motion for Preliminary Injunction be denied.

BIG Y FOODS, INC.

By: _____
MARK MASON, ESQ.
BBO#544936
Cooley, Shrair P.C.
1380 Main Street, Fifth Floor
Springfield, MA 01103
Tel (413) 781-0750
Fax (413) 733-3042

Dated:  8/26/04

### CERTIFICATE OF SERVICE

I, Mark D Mason, Esq., hereby certify that a copy of the foregoing Memorandum of Law In Opposition to Plaintiff's Motion for Preliminary Injunction has been mailed, postage prepaid, this 26th day of August, 2004, to:  Dennis A. Murphy, Esq., Goulston & Storrs, P.C., 400 Atlantic Avenue, Boston, Massachusetts 02110.

_____
MARK MASON, ESQ.

4163.223/66258

EXHIBIT

A

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

04-J-344

JOHN R. ALLEN

vs.

R.K. ASSOCIATES, INC.

ORDER

This matter is before the court on the defendant, R.K. Associates, Inc.'s (R.K.), petition seeking review, pursuant to G. L. c. 231, § 118, par. 1, of an order of the Superior Court allowing the plaintiff, John R. Allen's motion for injunctive relief. After review of the petition and opposition, I vacate the injunction dated July 16, 2004.

R.K. owns a shopping center in Marlborough, Massachusetts (the mall). In 1994, R.K. entered into a lease with Subway Real Estate Corp. for the operation of a Subway shop at the mall. Allen, a sublessee, operates the Subway shop.[1]

The lease between R.K. and Allen to operate the Subway shop contains the following restrictive covenant:

> "Landlord agrees not to sell, lease, let, use, or permit to be used, any property owned or controlled by it within one mile of the leased premises now or at any time during the period of this Lease or an extension to any [*] tenant or subtenant whose main principle (sic) business is the sale of submarine sandwiches or deli-type sandwiches, such as Miami Sub, D'Angelos, Blimpies, Kelly's Roast Beef, Scholtzsky. . . . [**] [Notwithstanding] the above, Landlord shall have the right to lease space to a pizza restaurant and/or Brueggers Bagel or to any restaurant whose primary business is not the sale of submarine or deli-type sandwiches."

On June 29, 2004, Allen filed a verified complaint seeking, inter alia, an injunction,

---

[1] For ease of reference, the claim of the plaintiff Allen may from time to time be attributed to the business, Subway.

enjoining R.K. from leasing space in the mall to the operator of a Panera Bread Bakery Café (Panera). After a hearing, a Superior Court judge enjoined R.K. "from leasing its Marlborough commercial space, . . . to Panera Bread." This petition followed.

"Appellate review of a trial court order disposing of a preliminary injunction application . . . focuses on whether the trial court abused its discretion – that is, whether the court applied proper legal standards and whether the record discloses reasonable support for its evaluation of factual questions." Edwin R. Sage Co. v. Foley, 12 Mass. App. Ct. 20, 25 (1981). To obtain a preliminary injunction, the moving party must demonstrate "both a likelihood of success on the merits and a substantial risk of irreparable harm." Wilson v. Commissioner of Transitional Assistance, 441 Mass. 846, 851 (2004).

In this case, the turning points in assessing likelihood of success depend on whether Panera's sandwich "offerings," using Panera baked breads, fall within the class of "deli-type" sandwiches prohibited by the lease and whether, if so, deli sandwiches are the main and principal business of Panera. Panera contends its sandwiches are speciality sandwiches -- not deli-like -- and that, moreover, sandwiches comprise only roughly 30% of its sales, the remaining approximately 70% consisting of the sale of other Panera products.

Applying the preliminary injunction standards above stated, if the Panera sandwiches are not truly deli sandwiches, and if such sales are not the greater, i.e., the principal amount of, and primary component of, the Panera business, then, it would not be more probable than not that Subway would prevail on its complaint for enforcement of the restrictive covenant, nor on its claim that the lease was violated by Panera having space in the mall. In my opinion, based on the extant record, the probabilities do not tilt toward Subway, which has the burden of proof at this

2

litigation point in seeking an injunction pendente lite. (This is not, of course, to be construed as any assessment of the ultimate merits to be developed at trial). The specific references in the lease benote a discrete and limited class -- submarine and deli sandwiches -- and do not encompass the varied and diverse universe of all "structures" of bread with embedded contents, such as the composite of Panera bread surrounding sandwiches, a version of which is named panini. Even the named exclusions in the lease, e.g., Miami Sub, D'Angelos, Blimpies, Kelly's Roast Beef, Scholtzsky benote submarine/deli based sandwiches; contrast the name Panera Bread Bakery Café.

Second, in my opinion, Subway's claim fails on the other preliminary injunction prerequisite, demonstrating substantial risk of irreparable harm. On this point, I am not persuaded that the extant record supports the Superior Court determination that Subway would be irreparably harmed if an injunction did not issue. Nor does the record, contrary to the summary conclusion set forth in a short footnote in the Superior Court order, establish that the potential economic loss is such that the very existence of the Subway business is threatened. The information compiled by Subway by having an investigator randomly view two other Panera stores in different places on four days is foundationally inadequate to demonstrate the economic end of (e.g. the ultimate irreparable harm to) Subway, if a preliminary injunction is not granted. See Hull Municipal Lighting Plant v. Massachusetts Municipal Wholesale Electric Co., 399 Mass. 640, 643 (1987). In addition, the prospect of economic harm to Subway can be reduced by accelerating the case for disposition (as was requested by the defendant R.K. -- and apparently opposed by Subway) including but not limited to by an expedited and consolidated trial on the merits pursuant to Mass.R.Civ.P. 65(b)(2).

3

Third, there is an inherent error of law in the terms of the injunction. The injunction

prohibited the defendant R.K. from leasing the property to Panera. That part of the injunction is

contrary to sworn statements from R.K. that a lease has already been entered into between Panera

and R.K., and that Panera has already commenced a build out of the premises. That being so, the

form of the injunction as entered is erroneous and unenforceable.

For all of the foregoing reasons, the order dated July 16, 2004 is vacated.

By the Court (Berry, J.)

Assistant Clerk

Entered: August 2, 2004.

4

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.: 4:04-CV-40149

HOLDEN COMMONS, LLC.,
            Plaintiff     )
                   )
vs.                  )     **AFFIDAVIT OF CHARLES L. D'AMOUR**
                   )
BIG Y FOODS, INC.,     )
            Defendant )

I, CHARLES L. D'AMOUR, being duly sworn hereby depose and say that:

1. I am the Executive Vice President and Chief Operating Officer of Big Y Foods, Inc., and am familiar with the facts set forth in this within Complaint.

2. Big Y is a Massachusetts corporation with its home office located in Springfield, Massachusetts. Big Y owns and operates a chain of fifty (50) supermarkets in Massachusetts and Connecticut.

3. Big Y entered into a long-term lease (the "Lease") with Reservoir Realty Trust ("Reservoir") on April 15, 1988 for the Premises. Big Y has operated a supermarket at the Premises since such time. Holden assumed Reservoir's interest under the Lease in 1999. The Lease has been amended twice, once to expand the square footage and a second time to adjust the rent and extend the term of the Lease. The Lease provides Massachusetts law will govern any disputes over the interpretation of the Lease. Lease at section 34(d), page 53.

4. Prior to 1987, supermarkets in other states, including Stop & Shop, Edwards Warehouse, First National Stores, Walbuam's, Pathmark and Shop-Rite, customarily operated pharmacies selling prescription drugs on their premises. Since 1987, it has been the custom for supermarkets in Massachusetts to operate pharmacies selling prescription drugs on their premises.

5. The Lease provides, in pertinent part, as follows:

"2. Term and Options to Extend. (b) *** Notwithstanding anything contained above to the contrary, Lessee shall not be required to open for business, nor shall the Commencement Date be deemed to have occurred until such time as Lessor has executed leases for at least seventy-five percent (75%) of the available leaseable square footage in the Shopping Center including one such store being a drugstore with a pharmacy being operated by a regional major chain. Lessee, at its option, may waive the contingency contained in this clause.

***

5. Use. Lessee agrees to use the premises for the initial purpose of operating a store commonly known as a supermarket selling merchandise customarily carried in supermarkets. "Supermarket" shall mean a store similar in operation to Stop & Shop, Edwards Warehouse, First National Stores, Waldbaum's, Pathmark and Shop-Rite, operating as a conventional supermarket or warehouse-type supermarket. Lessee may elect to change the use of the premises for any lawful purpose provided that at the time of such change in use there is not then a competing business located within the Shopping Center and further provided that it obtains the consent of Lessor, which consent shall not be unreasonably withheld or delayed. If Lessee fails to consent to such changed use the Lessor shall have the option to terminate this Lease and release Lessee from further liability hereunder.

***

6. Restrictions on Use. (a) The Lessor will not lease, rent or permit to be occupied by any person any part or the whole of any premises owned, leased or controlled by Lessor, its stockholders, officers, directors or employees located wholly or partially either within the entire premises, or within a distance of five (5) miles from any portion of the premises described in Exhibit "A" for the sale of groceries, meat, fish, fruits, vegetables, food products and food supplies of any kind, at wholesale or retail or for off premises consumption, with the exception of the normal drug store, smoke shop, book or newsstand shop counter items such as potato chips, crackers, soda, candy, gum, cigars, or cigarettes; with the exception of a restaurant or ice cream shop

2

which would have take-out service and with the exception of a convenience store which is not in excess of 5,000 square feet."

Lease at section 2, pages 3-4 and sections 5,6, pages 13-15 (emphasis added).

6.  Holden leases retail space in the Shopping Center to Consumer Value Stores ("CVS"). CVS operates a retail store at the Shopping Center, which, upon information and belief, sells various goods such as food, milk, soda, ice cream, stationary, health and beauty products, as well as prescription drugs.

7.  It was the intention of the parties to keep the definition of the term "supermarket," as set forth in the Lease, current within the supermarket industry.

8.  Big Y was not on notice of restrictive covenants in the CVS lease at the time it was executed.

9.  Big Y intends to open a pharmacy department at the Premises in or about November 2004.

10. A Stop & Shop, which is 4.2 miles from the Premises, currently maintains a pharmacy department on its premises.

11. During its tenancy, Big Y has sold a variety of items, including but not limited to food, health and beauty aids, newspapers, cigarettes, and prepared foods.  Holden has never attempted to restrict Big Y's sale of such items.

Subscribed and sworn under the pains and penalties of perjury this 26th day of August, 2004.

Charles L. D'Amour,  Executive Vice President
and Chief Operating Officer
Big Y Foods, Inc.

4163.223/66669

3